IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL ALLEN KENNEDY, an
individual,

            Plaintiff,

        v.

DESCHUTES COUNTY BOARD OF
COMMISSIONERS, SUNRIVER SERVICE
DISTRICT, SUNRIVER OWNERS
ASSOCIATION,

            Defendants.
_____

Case No. 6:12-cv-01319-MC

OPINION AND ORDER

MCSHANE, Judge:

      Defendant Sunriver Service District (the "District") moves for summary judgment against

plaintiff Michael Kennedy's claims of retaliation, wrongful discharge, and whistleblowing.

These claims are the sole claims remaining in this action. Kennedy alleges the District

unlawfully terminated his employment in violation of his First Amendment rights. Kennedy's

relevant speech concerned three issues: (1) an ongoing debate over the legal status of Sunriver's

roadways; (2) the District's failure to utilize third-party review of contracts with the Sunriver

Owners Association (the "Association"); and (3) civil stalking protective order proceedings

1 – OPINION AND ORDER

involving Sunriver resident Robert Foster and Sunriver police officers. Kennedy's speech is not "protected speech" in the First Amendment retaliation context. And even if Kennedy's speech was protected here, Kennedy fails to link that speech in any way with the decision to terminate his employment. The District's motion for summary judgment (ECF No. 87) is GRANTED.

## BACKGROUND[1]

Kennedy was the Chief of Police of the District from 2000 until 2012. The Deschutes County Board of Commissioners created the District to provide fire and police services in Sunriver. The District if governed by a five-person board of directors, two of whom sit on the Association. Throughout the years, there was some tension between Kennedy, the Association, and the District. In 2012, the District's board voted unanimously to terminate Kennedy's employment. Kennedy's claims revolve around his speech on three issues.

### I. The Road Issue

Near the time Kennedy became the Chief of Police, there was a debate over whether Sunriver's roadways were highways or "premises open to the public." Kennedy argued the roads were highways and that the state traffic laws applied (and Sunriver police officers could make traffic stops based on violations of state statutes). The Association argued the roads were "premises open to the public."

Individuals stopped for traffic violations began challenging those stops (and the searches arising from the stops), arguing the roads were not highways. Kennedy testified the roads were highways. The judge agreed.

---

[1] As this is the District's motion for summary judgment, I construe all facts in the light most favorable to Kennedy, the non-moving party.

2 – OPINION AND ORDER

The matter, however, was not resolved. The Association later purchased an ATV for use on the roadways. Kennedy argued that under Oregon law, ATVs were not allowed on highways. The Association disagreed. This led to more tension between the Association and Kennedy.

The debate continued over the next few years. The Sunriver District Attorney ("DA") said not classifying roads as highways would result in criminals having free reign in Sunriver. Kennedy agreed.

In 2007, the board voted to alter the definition of roads, concluding they were not premises open to the public. The police were prohibited from making minor traffic stops. This made National news and generated much bad publicity for Sunriver. The board was humiliated and blamed Kennedy. Later that year, the Oregon Legislature clarified the matter by declaring the roads highways.

## II. The Third-Party Contract Review Issue

By rule, contracts for services and vendors between the District and the Association had to be reviewed by a third party. Kennedy alleges that before he spoke up on the issue, there was no third-party review and the district paid more for the contracts. Kennedy discussed the contract issue with others, who agreed with him and brought it before the board. Kennedy also wrote one email to the Association's General Manager in 2002. The email stated:

> With the recent events regarding our former Sheriff's in propriety and the subsequent criticism of the County Commissioners regarding their lack of oversight, I think we are all feeling an increased sense of urgency regarding the adoption of a Contract/Purchasing policy and a legal review of the current Admin contract. I have spoken with several board members regarding this and have mentioned it to Sharon Smith. I hope this will be addressed at the next Board meeting.

Kennedy Ex. F, 7.

3 – OPINION AND ORDER

Kennedy alleges his speech on the contracts infuriated the Association. After Kennedy raised the issue, third parties began reviewing the contracts. As a result, the price of the contracts fell and the Association received less money from the District. Kennedy wrote the email in 2002 and the contract issue was resolved ten years before his termination.

## III. The Robert Foster Issue

In 2008, Kennedy wrote a report to the DA stating:

> For the past several years, Robert Benjamin Foster has engaged in repeated and unwanted contact with members of the Sunriver Police Department. This unwanted contact has caused apprehension among our officers and has interfered with their ability to perform their duties. These contacts include challenging officers while they are conducting traffic stops; following officers while they are both on and off duty; confronting officers while they are on and off duty; driving around the Sunriver Police Department, sometimes several times a day; and parking outside the Sunriver Police Department for extended periods of time with no apparent reason.

Kennedy asked the DA to "consider charging Mr. Foster with Stalking." The DA informed Kennedy it would be a tough case.

In February 2010, Joseph Patnode, a Sunriver police officer, alleged Foster followed him home. Patnode pulled over and they had a confrontation. Kennedy went to the Association (who owned the building the police department rented) and asked to trespass Foster from the building. The Association sent Kennedy to the board. Robert Franz, the board's legal counsel, called Kennedy and said the police department would file a stalking order against Foster. Kennedy told Franz of the problems with making that case. Franz said they would file it on behalf of two officers who had run-ins with Foster.

Kennedy contacted the two officers, who agreed to have stalking orders filed against Foster. Foster fought the orders and eventually filed a tort claim notice against the Association, the District, and Kennedy.

Many letters to the local newspaper were published on this topic. It was big news in Sunriver. Kennedy's essentially argues that the Association urged him to initiate the stalking petitions against Foster, Kennedy supported the petitions, the case led to much bad publicity, and then the Association backpedaled and fired him due to the bad press.

Kennedy makes much of a conversation between John Salzer and Foster in the hallway of the courthouse prior to a hearing. Salzer was a board member from 2002-05 and an acquaintance of Foster's. No one remembers when this meeting occurred. Kennedy argues it must have happened in January 2012. Salzer, however, stated the conversation occurred roughly one year before Kennedy's termination. The conversation lasted less-than one minute and was only between Foster and Salzer. Salzer expressed disappointment with the proceedings. The two discussed the case and suggested that maybe if Kennedy was no longer the Chief of Police the case would resolve.

There is no indication any of the 2012 board members knew of this conversation, or that Salzer even spoke of Kennedy with any of the 2012 board members. There are plenty of deposition exhibits of the 2012 board members. They all say Kennedy had to go because Sunriver needed a change. None of them even knew Kennedy was involved of the contract issue and few remembered the roadway issue. The stalking issue was more contemporaneous so they did know of that.

Regarding Salzer, Kennedy also attempts to make a mountain out of a June 2005 "secret memorandum" Salzer (who was leaving the board) sent to Doug Seator, the incoming board chair. Salzer wrote down some concerns he had about Kennedy. He lists four things. One item is the roadway issue. Salzer notes Kennedy's position was in conflict with the Association's and

summarized the issues. He also states Kennedy is difficult to deal with and pouts when he does not get his way. The letter is from 2005.

## STANDARDS

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

Kennedy alleges he suffered retaliation after exercising his First Amendment rights. Kennedy must establish three elements: (1) that he spoke on a matter of public concern; (2) that he spoke as a private citizen and not as a public employee; and (3) that his protected speech was a substantial or motivating factor in the District's decision to terminate his employment. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

### I. Did Kennedy Speak on a Matter of Public Concern?

Speech is "a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Johnson v. Multnomah Cnty.*, 48

F.3d 420, 422 (9th Cir. 1995) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). Speech alleging that public officials are not discharging government responsibilities, or are undertaking in wrongdoing or breaches of the public trust qualifies as a matter of public concern. *Connick*, 461 U.S. at 148. Speech is not of public concern when it addresses "individual personnel disputes and grievances." *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (citation omitted).

The court determines whether speech qualifies as a matter of public concern by considering the content, form, and context of a given statement. *Johnson*, 48 F.3d 420, 422 (citing *Connick*, 461 U.S. at 147-48). Among those three factors, content is the most important. *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009). It is plaintiff's burden to demonstrate that the speech relates to the public concern. *Johnson*, 48 F.3d at 422. Whether the speech is truly a matter of public concern "is purely a question of law." *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

Each issue Kennedy spoke of arguably qualifies as a matter of public concern. These were not typical workplace grievances. Most of the issues received a fair bit of press in local papers. Most of these issues were discussed in public at multiple district board meetings and were at least tangentially related to the functioning of local government. For example, on the road issue, could Sunriver police lawfully stop speeding motorists? Could Sunriver's recently purchased ATV lawfully drive on Sunriver's roads? The matters involved local politics and, at least with regard to the contract issue, involved potential government waste. Although the stalking order issue is a close question, it ultimately resulted in court proceedings that were well-attended. Each issue involved topics of concern in the local community. I conclude they qualify as matters of public concern.

7 – OPINION AND ORDER

That said, Kennedy rarely points to any specific speech he actually made. Kennedy points to a few emails sent many years ago. Kennedy points to a few isolated comments at board meetings many years ago. Kennedy points to one public powerpoint presentation from years ago regarding the roadway issue. Kennedy's briefings generally outline a lot of speech made by others on the above issues. Kennedy's briefings also rely heavily on a lot of Kennedy's deposition testimony about the local political issues and what his perception of the thoughts of other local figures. But Kennedy only glances over what his actual speech was. Considering Kennedy brings a First Amendment retaliation claim which depends entirely on Kennedy's own speech, this is a large problem for Kennedy. But I assume Kennedy in fact spoke on matters of public concern.

## II. Did Kennedy Speak as a Private Citizen or Public Employee?

Kennedy bears the burden of demonstrating he spoke as a private citizen and not as a public employee. *Eng*, 552 F.3d at 1071. "Statements are made in the speaker's capacity as a citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Id.* (quoting *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008) (internal quotations omitted).

Kennedy's speech as to the roadway and stalking issues were certainly made in his capacity as police chief. Kennedy himself stated as much during his depositions. As to the roadway issue:

> Q: Would you agree that the positions that you were advancing regarding this highway issue as we will refer to it were taken in your capacity as chief of police?
>
> A: Yes

Q: And the positions you were advancing on that issue were positions that you believed you were obligated to take as part of your job, part of your job responsibilities as police chief; correct?

A: Yes. I do believe that.

(Def. Memo. Supp. Sum. J., 5 (quoting Kennedy Depo., 65:11-19).)

And with regard to the stalking petition:

Q: In that meeting with Mr. Nelson and the other board members whenever it occurred where the stalking order case was discussed, you were appearing in your official capacity as the police chief at the board meeting; correct?

A: That's correct.

Q. And whatever comments you made to the board in that meeting were in your capacity as the police chief pursuant to what you thought were your duties and responsibilities?

A: That's correct.

(Def. Memo. Supp. Sum. J., 7 (quoting Kennedy Depo., 128:1-13).)

Earlier in the deposition, Kennedy states he became involved with the stalking orders because he was concerned about Foster's behavior with the police department:

Q. And at that time, Mr. Kennedy, can we agree that you were still concerned on [the officers'] behalf about the behavior, the ongoing behavior of Robert Foster?

A. I believe the behavior of Robert Foster towards the entire department was inappropriate.

Q. That behavior was that he was harassing and stalking your officers; right?

A. Correct. That's what I would say.

Q. Were you concerned in part about your officers' safety in light of that conduct?

A. yes, I was.

Q. And did you believe or at least hope that by filing these stalking order petitions that the Foster problem would be resolved?

A. I would have rather gone a different direction but if it worked, I would have been very happy.

9 – OPINION AND ORDER

Kennedy Depo., 116:3-21.

Without doubt, a Police Chief's comments on whether officers have the ability to enforce the state's traffic laws involve comments spoken in one's role as the Police Chief, not as a private citizen. Kennedy's deposition testimony only confirms that. As for the stalking order speech, Kennedy worried about Foster harassing his police officers. Indeed, Kennedy stated he thought "the behavior of Robert Foster towards the entire department was inappropriate." So Kennedy took appropriate actions; actions to protect his officers and the entire police department. At the board meeting where this was discussed, Kennedy admitted he spoke of the stalking orders at that meeting in his official capacity, under his obligations as the Chief of Police.

The Supreme Court somewhat recently dealt with a First Amendment retaliation case involving a plaintiff deputy district attorney. *Garcetti v. Ceballos*, 547 U.S. 410 (2006). A junior attorney noticed irregularities in a warrant and asked the plaintiff's advice. Plaintiff investigated and wrote a memo to his supervisors detailing his strong suspicions regarding the irregularities and recommending dismissing the charges. After some contentious meetings, plaintiff ended up testifying at a hearing on a motion to dismiss (which was ultimately denied). Plaintiff alleged he was demoted for the memo.

The Supreme Court noted a public employee has no First Amendment protections for speech made in the course of one's daily duties. *Id*. at 421. The Court contrasted that speech with speech made as a private citizen, such as when a teacher was reprimanded following letters to the editor of a local newspaper. *Id*. at 422. The Court concluded:

> Ceballow did not act as a citizen when he went about conducting his daily
> professional activities, such as supervising attorneys, investigating charges, and
> preparing filings. In the same way he did not speak as a citizen by writing a memo

10 – OPINION AND ORDER

that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.

*Id.*

Kennedy did not speak as a private citizen when commenting on traffic and law enforcement issues, or when taking action against an individual whose actions threaten officer safety. On those issues, Kennedy spoke in his capacity as the Chief of Police of Sunriver. Kennedy includes his Position Description, arguing none of the issues fall under his official duties. The Position Description states:

> Responsible for all law enforcement functions, crime prevention, patrol of Sunriver roads and pathways, airport facilities, traffic control, criminal investigations and records maintenance. The Chief monitors and maintains professional discipline within the Department, and assures that all employees are properly trained. The Chief is responsible for the effective and efficient utilization of Department personnel, funds, equipment, facilities and working schedules. The Chief will develop and implement the vision, goals and mission statement for the Department. The Chief also has major responsibility for budget preparation and administration and representing the Department at numerous public meetings. The position is required to exercise considerable judgment and latitude in solving management, and law enforcement problems.

Resp. 26.

Formal job descriptions, however, are not dispositive as the proper analysis is a practical one, and "formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform . . . ." *Id. at 424-25*. That said, Kennedy's formal job description does not help his claims. All three issues fall generally under his formal job descriptions. Additionally, although public employees do not check their Constitutional rights at the door, "[o]fficial communications have official consequences," and public employers are entitled to make sure

their employees' official communications contain sound judgment and "promote the employer's mission." *Id.* at 422-23.

As for the contract issue, speaking out on potential government waste could certainly entail speaking as a private citizen. But Kennedy was not an ordinary Sunriver citizen. Kennedy was the Police Chief. His formal job description states he is responsible for the effective and efficient use of department funds. Kennedy also was responsible for budget preparation. The department contracted with the Association. By law, those contracts were supposed to be reviewed by third parties.

Kennedy's 2002 email to the board mentioned the contract issue. The email addressed four topics, each with its own heading. Also discussed was the hiring of an officer, "Law Enforcement Authority" confirming Sunriver officers enjoy the same authority as other Oregon police officers enjoy, "Status of Roadways," and "Contracting Purchasing Policy." Each issue involves general topics the Chief of Police would present to the board. Considering Kennedy's position, any speech on the contract issue came in Kennedy's position as Chief of Police, and not in the capacity as an ordinary citizen of Sunriver. Once again, Kennedy wrote that email in 2002.

## III. Was Kennedy's Protected Speech a Motivating Factor in the District's Decision to Terminate Kennedy's Employment? [2]

Kennedy also has the burden of demonstrating the speech was a "substantial or motivating" factor behind the district's decision to terminate him. *Eng*, 552 F.3d at 1071.

Kennedy presents no direct evidence that any of the board members took any of his allegedly protected speech into consideration in making the determination to fire him. Most of Kennedy's speech occurred <u>years</u> before his termination. Kennedy relies on speculation,

---

[2] Although Kennedy did not speak as a private citizen on matters of public concern, I examine the causation element as it factors in to Kennedy's state claims discussed below.

12 – OPINION AND ORDER

including speculation regarding a vast conspiracy between the board, former board members, and the Sunriver Owner's Association to terminate him for failing to toe the company line.

As noted above, Kennedy is not entirely clear about his specific speech: what exactly he said, when he said it, and to whom. It is Kennedy's burden to demonstrate that his speech motivated the board to fire him. Kennedy last spoke about the third-party contract review back in 2002. Other than Kennedy's own speculation, no evidence demonstrates any board member even knew Kennedy said anything, or took any position at all regarding the third party contract review. The road issue was resolved in 2007 by the Oregon Legislature. At most, one of the 2012 board members served in 2007.

In its Reply, the District outlines what I agree seems to be the gist of Kennedy's causation argument:

> As best defendant is able to intuit from plaintiff's convoluted [Owner's Association] arguments, his theory on the critical element of causation in this case goes something like this: since plaintiff had managed to anger one or more [Association] board members over the years on such matters as the road jurisdiction issue and third-party contract review, those [Association] board members consciously decided to retaliate against the plaintiff by stacking the defendant service district board with members who shared [the Association's] anger towards the plaintiff. Years later, those [Association] "proxies" on the district board then gave vent to the [Association's] intended retaliation by voting to terminate plaintiff in February 2012. In addition to being nonsensical, this theory is devoid of any supporting evidence in this record. The third-party contract review issue surfaced during 2002/2003. The "road issue" had been resolved by 2007. None of the five service district board members who voted for plaintiff's termination in February 2012 had anything to do with either issue.

Reply, 10.

The stalking issue was more contemporaneous with Kennedy's firing. Again, I am forced to guess at what Kennedy said on this issue, who he said it to, and when he said it. Kennedy asked the DA to press charges. Kennedy asked the Association to trespass Foster. Those actions

13 – OPINION AND ORDER

took place years before Kennedy's termination.  While the issue remained in the headlines for a few years, there is no evidence Kennedy said anything at all on the subject at any point in time near February 2012.

Kennedy makes much of the exceedingly brief conversation between Foster and Salzer in the hallway of the courthouse. There is no evidence that Salzer even mentioned that conversation to any board member.

The board members each stated they terminated Kennedy because he was resistant to change, did not work well with others, and refused to take a more active role in regard to community relations. *See* Mersereau Decl., Ex 1, 12 ("[Debra Baker voted to fire Kennedy] because I didn't feel that he had the ability to change. He was not a forward thinker.  He was not creative. He was not somebody that could move in the direction that the board wanted to go, which was to engage the community."); *Id*. at Ex. 2, 8 (Frederick Angell voted to terminate Kennedy because Kennedy was incapable of changing the culture of the police department to become a part of the community); *Id*. at Ex. 3, 2-3 (Robert Nelson voted to terminate Kennedy because Kennedy was not truthful, was belligerent, intimidated people, and because Nelson could no longer trust Kennedy); *Id*. at Ex. 4, 1-2 (Donald Wilson voted to terminate Kennedy because Kennedy had "a complete lack of leadership skills" and would not participate in any community efforts); *Id*. at Ex. 5, 2-3 (Robert Wrightson voted to terminate Kennedy because Kennedy could not accomplish necessary changes within police department).

Although Kennedy disagrees with the opinions of the board, those disagreements, and Kennedy's speculation about the board's true motives, do not raise a genuine question of material fact necessary to survive summary judgment. Even viewed in the light most beneficial to Kennedy, there is no evidence that any of the above issues Kennedy allegedly spoke upon

14 – OPINION AND ORDER

played any part, let alone a substantial or motivating factor, in the board's decision to terminate Kennedy.

**State Claims**

Kennedy also brings state claims for wrongful discharge and whistleblowing. An employer wrongfully discharges an employee when the termination comes from the employee exercising a job-related statutory right or for fulfilling an important public duty. Kennedy argues his actions fall under fulfilling an important public duty. Courts, however, "cannot create a public duty but must find one in constitutional or statutory provisions or case law." *Eusterman v. Northwest Permanente, P.C.*, 204 Or. App. 224, 229-30 (2006). Because Kennedy does not tell me, I am unsure what statute or constitutional provision Kennedy brings this claim under. Kennedy's general direction that he must truthfully enforce the state's laws does not rise to a wrongful discharge claim. Additionally, as discussed above, Kennedy has failed to establish any causation between any specific acts (whatever they actually were) and his termination.

As for the whistleblowing claim, one could certainly bring such a claim based on exposing government waste. A public employer may not take terminate an employee for disclosing information that the employee reasonably believes is evidence of a violation of federal or state law, or a rule or regulation of a political subdivision. The contract issue, however, was resolved in 2002, ten years before the board voted unanimously to terminate Kennedy.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

15 – OPINION AND ORDER

## CONCLUSION

Defendant's motion for summary judgment (ECF No. 87) is GRANTED.

IT IS SO ORDERED.

DATED this 2nd day of June, 2014.


_____/s/ Michael J. McShane_____
Michael McShane
United States District Judge

16 – OPINION AND ORDER